United States District Court
Nothern District of Ohio
801 West Superior Avenue
Cleveland, Ohio 44113-1837

Dan Aaron Polster
Judge

Phone (216) 357-7190
Fax (216) 357-7195

September 11, 2026

Kelly L. Stephens, Clerk
United States Court of Appeals for the Sixth Circuit
100 East Fifth Street, Room 540
Potter Stewart U.S. Courthouse
Cincinnati, OH 45202-3988

Re: Case No. 26-3780, *In re: OptumRx, Inc., et al.*
Originating Case No. 1:17-MD-2804

Dear Ms. Stephens:

Thank you for the invitation to address the petition for writ of mandamus filed by the pharmacy benefit manager defendants ("PBMs") in connection with Multidistrict Litigation No. 2804, *In re Nat'l Prescription Opiate Litig.* ("Opioid MDL"). Please find my response below.

## I. Some History: The Sixth Circuit's Prior Mandamus Review of Similar Issues in the Opioid MDL.

This is the fourth time an Opioid MDL defendant has sought mandamus review of an order I entered granting a motion to amend a complaint. The other three provide important background:

- **Case no. 20-3075.** Pharmacy defendants filed a petition after I allowed Opioid MDL plaintiffs to amend their complaints to add new claims against them "more than 10 months after discovery had closed." *In re: CVS Pharmacy, Inc.*, 956 F.3d 838, 842 (6th Cir. 2020). The Sixth Circuit granted mandamus relief, observing that, while "an MDL court has broad discretion to create efficiencies and avoid duplication—of both effort and expenditure—across cases within the MDL," the fact that "discovery . . . was already complete . . . gave the [pharmacy defendants] certain procedural rights that the district court was bound to respect." *Id.* at 841, 845.

Here, in contrast, every single MDL plaintiff at issue sought to amend their complaint ***before discovery in their individual case had begun***. *See Issue Ruling Six* at 2 ("no discovery has commenced in any of the cases at issue"). The procedural postures of *In re: CVS Pharmacy* and the instant case are not comparable. It is simply not true that I engaged in "a persistent disregard of the federal rules" by repeating the same error. Petition at 40.

- **Case no. 20-3075.** After the Sixth Circuit granted the petition in *In re: CVS Pharmacy*, I granted a motion to amend filed by a ***different*** MDL plaintiff to add the same pharmacies as defendants. The pharmacy defendants again sought relief from the Sixth Circuit, filing a "motion to enforce writ of mandamus." *See* case no. 20-3075, docket no. 51. The pharmacy defendants accused me of once again "disregard[ing] the Rules' requirements in the Pharmacies' cases" by allowing amendment of the complaint. *Id.* at 10.

  I submitted a response explaining at length how I had "faithfully and promptly carried out every aspect of the Sixth Circuit's mandate," and had also been careful to ensure amendment was only allowed "before discovery had begun." Docket no. 52 at 1, 7. This was the opposite of any "persistent disregard" of any rule or ruling. One week later, the Sixth Circuit dismissed the pharmacies' motion to enforce the writ. Docket no. 54-2.

- **Case No. 21-4051.** Here, a different pharmacy (Meijer) challenged a later Opioid MDL order I entered allowing plaintiffs to amend their complaint to add Meijer as a defendant. Meijer filed a mandamus petition, cited *In re: CVS Pharmacy*, and repeated the refrain that my order "manifests a persistent disregard of the federal rules." Case no. 20-3075, docket no. 1-2 at 9. The Sixth Circuit observed that "Meijer was added to this case before discovery ever started" and therefore concluded that, even though "the district court's scheduling order was unconventional," the petition must be denied. *In re: Meijer, Inc.*, 2022 WL 20701236, at *1 (6th Cir. Nov. 10, 2022).

This history undermines completely the PBMs' petition. The Sixth Circuit has repeatedly ***rejected*** the argument that I have shown a "persistent disregard of the federal rules;" to the contrary, ever since the Sixth Circuit corrected me in *In re: CVS Pharmacy*, I have been assiduous in complying with the Court's directives. In the latter three bullet-point instances discussed above, and also in ***every single MDL case*** where I granted the motion to amend that PBMs now challenge, discovery had not begun.

The Sixth Circuit has confirmed that "an MDL court has broad discretion to create efficiencies and avoid duplication—of both effort and expenditure—across cases within the MDL." *In re: CVS Pharmacy*, 956 F.3d at 841. As explained below, that is

what I have done, while still ensuring adherence to "the rules of law applicable to each of those cases." *Id*.

## II. Efficient Application of the Federal Rules of Civil Procedure: My Use of "*Issue Rulings*."

I strongly urge the Sixth Circuit to read and ***construe as one document*** my six "*Issue Rulings*," along with my final "Order Regarding Plaintiffs' Motions for Leave to Amend."[1] These seven documents are each part of a coordinated, integrated, comprehensive approach that I implemented to address plaintiffs' motions to amend, which were filed in just over 1,800 individual MDL cases.

I will provide only a summary of my lengthy *Issue Rulings* process in this letter, but enough to refute the PBMs' arguments.

### A. Context and Background: How the Opioid Litigation Unfolded.

In the very first Case Management Order ("CMO") I entered in the Opioid MDL, I ruled that "no complaint shall be amended by Plaintiffs to add a party or otherwise, absent leave of Court or stipulation of the parties." MDL docket no. 232 at 9 (April 11, 2018). In other words, I essentially placed an ***ongoing*** moratorium on filing a motion to amend the complaint in every MDL case. *See Issue Ruling Five* at 12 ("The Court's moratorium on substantive filings operated as a constraint throughout the entire relevant period. That moratorium completely foreclosed any non-bellwether MDL Plaintiff from filing any substantive motion—including motions seeking leave to amend—since the MDL's inception."); *see also id.* at 2 (discussing the procedural history of this moratorium).

Following entry of this first CMO, the parties proceeded to litigate. The Opioid MDL is unusually complex and includes numerous categories of plaintiffs and defendants; accordingly, the parties' and the Court's focus naturally changed as the litigation progressed. Initially, the MDL concentrated on government subdivision plaintiffs' claims against opioid ***manufacturers***, like Purdue Pharma, Teva, and

---

[1] These seven documents are attached to the petition as Exhibits A-G, and are also attached to this letter for the Panel's convenience. For easy citation reference, they are: (1) *Issue Ruling One*, MDL docket no. 6306; (2) *Issue Ruling Two*, MDL docket no. 6379; (3) *Issue Ruling Three*, MDL docket no. 6418; (4) *Issue Ruling Four,* MDL docket no. 6428; (5) *Issue Ruling Five*, MDL docket no. 6553; (6) *Issue Ruling Six,* MDL docket no. 6599; and (7) Order Regarding Plaintiffs' Motions for Leave to Amend, MDL docket no. 6650.

Johnson & Johnson. Later, MDL attention turned to subdivision plaintiffs' claims against opioid ***distributors***, like McKesson, AmerisourceBergen (n/k/a Cencora), and Cardinal Health. Next, the litigation focus moved further down the pharmaceutical supply chain to subdivision plaintiffs' claims against opioid ***dispensers***, like CVS, Walgreens, and Walmart. All nine of these defendants (and others) have since entered into global settlements.[2]

Over the last nine years, I chose different MDL cases to serve as bellwethers against these different groups of defendants. And I granted motions to amend every bellwether complaint to add new allegations, claims, and/or defendants. But, consistent with my moratorium, I have not (until six weeks ago) granted a motion to amend in ***any non-bellwether MDL case*** since March of 2019. To the contrary, I repeatedly discouraged any plaintiff from filing such a motion and denied any such motion that was filed. *See Issue Ruling Five* at 2-12 (recounting the entire MDL history of the moratorium and my rulings on motions to amend).

More recently, the MDL litigation focus shifted again, this time to an obscure participant in the opioid marketplace—the PBMs. Pharmacy Benefit Managers are "lesser-known . . . entities that administer the prescription benefits of the insurance plans," acting as "middle-men between pharmacies and insurers." *Matrix Distributors, Inc. v. Nat'l Ass'n of Boards of Pharmacy*, 34 F.4th 190, 194 (3rd Cir. 2022). "PBMs oversee critical decisions about access to and affordability of medications without transparency or accountability to the public. Indeed, PBM business practices and their effects remain extraordinarily opaque." *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies*, Fed. Trade Comm. Interim Staff Report at 1 (Jul. 2024).

The essence of plaintiffs' claims is that the PBMs allegedly conspired with opioid drug manufacturers to secure favorable placement on insurance company approved-drug-lists (known as "formularies"), producing greater sales for manufacturers and higher rebates and fees for PBMs. To test these claims, I picked two PBM bellwether cases in 2023 and 2024, which the parties are currently litigating.

In April of 2024, the Plaintiffs' Executive Committee ("PEC") asked me to lift my moratorium, so that other plaintiffs could move to amend their complaints to name

---

[2] This staged approach was first suggested by the Judicial Panel on Multidistrict Litigation in its original transfer order assigning the MDL to me. *See* MDL docket no. 1 at 3 ("[The defendants] argue that centralization of so many diverse claims against manufacturers and distributors will lead to inefficiencies that could slow the progress of all cases. * * * The transferee judge might find it useful . . . to establish different tracks for the different types of parties or claims.").

additional defendants, including: (1) PBMs, and (2) numerous smaller manufacturers and dispensers that, as revealed by updated opioid dispensing data produced by the U.S. Drug Enforcement Administration, had played a role in the supply of opioids into the plaintiff's jurisdiction. I had repeatedly rebuffed earlier, similar PEC requests, but concluded it was appropriate to lift the moratorium and give plaintiffs a "final opportunity to amend their complaints." MDL docket no. 5455 at 2 (May 23, 2024).

I knew it was essential, of course, that I continue to comply with the Sixth Circuit's instructions from *In re: CVS Pharmacy*. Specifically, although I am vested with "broad discretion to create efficiencies and avoid duplication—of both effort and expenditure—across cases within the MDL," any procedures I put into place still had to ensure my "determination of the parties' rights in [each] individual case [are] based on the same legal rules that apply in other cases, as applied to the record in that case alone." 956 F.3d at 841. The question thus became: how do I efficiently address many hundreds of motions to amend complaints, all submitted at the same time, while protecting the rights of each party in each individual case?

### B. The *Issue Ruling* Process.

My solution was to institute the "*Issue Ruling* process" now challenged by the PBMs. This process required the parties to proceed in six steps: (1) plaintiffs would file a single, omnibus motion to amend against each defendant, together with a list of each individual plaintiff that joined the motion; (2) each individual plaintiff would also separately set forth the relevant facts and law specific to their own case;[3] (3) the parties would submit briefs regarding the omnibus motion; (4) the Court would issue a series of *Issue Rulings* resolving issues common to all plaintiffs; (5) the parties would meet and confer and let the Court know if they agreed on how the *Issue Ruling* applied to each individual case; and (6) if the parties could not agree, they would say so, and the Court would issue a supplemental, case-specific ruling.[4]

There was a very good reason for "step one"—that is, requiring plaintiffs to file

---

[3] My Orders setting out steps one and two are recapitulated in *Issue Ruling Four*, pages 2-3.

[4] *See, e.g., Issue Ruling One* at 11-12 ("It now falls to the parties to apply [this *Issue Ruling*] to each individual case and report the results back to the Court. * * * If the parties cannot agree on how this *Issue Ruling* applies to a given case, they shall: (1) so note in their chart; and (2) submit a statement explaining their position."). *See also Issue Ruling* Five at 15 ("The Court will address . . . close calls, to the extent they exist and the parties cannot resolve them, after the parties have met and conferred and applied this *Issue Ruling*.").

a single, omnibus motion to amend against each defendant, rather than requiring each individual plaintiff to file its own motion. The PEC made it very clear that the allegations each plaintiff would seek to add against the PBMs were uniform, because the PBMs' alleged bad conduct and its effects were the same everywhere they did business; indeed, the PEC explained that each plaintiff's new allegations would be virtually identical to the allegations made in the two ***existing*** PBM bellwether cases (where each complaint was 300 pages).[5] It made no sense to require each of the hundreds of MDL plaintiffs to file replica motions to amend; this would be the opposite of "creat[ing] efficiencies and avoid[ing] duplication . . . across cases within the MDL." *Id.*

At the same time, however, I designed steps two through six to ensure "determination of the parties' rights in [each] individual case [are] based on the same legal rules that apply in other cases, as applied to the record in that case alone." *Id.* In fact, I purposefully included the PBMs, themselves, in that "determination of rights," asking them to either: (i) agree with plaintiffs on how my *Issue Rulings* applied to each individual case; or (ii) if they could not agree, provide position statements and I would deliver an individualized case ruling. *See, e.g., Issue Ruling* Two at 7 ("As stated in *Issue Ruling One*, it now falls to the parties to meet and confer and apply these rulings to each individual case and report back to the Court with their results. * * * The Court will decide individually any cases where the parties cannot agree on the application of this *Issue Ruling*.").

The PBMs' petition fails to disclose that the *Issue Ruling* process, and especially step 5 (application of the *Issue Ruling* to each individual case), repeatedly worked ***in the PBMs' and other defendants' favor***. Specifically:

- In *Issue Ruling One*, I agreed with the PBMs that the failure of an individual plaintiff to file a Plaintiff Fact Sheet "compels denial of those plaintiffs' motions to amend." *Issue Ruling One* at 9. Accordingly, I denied "leave to amend sought by any plaintiff that has not submitted a [Plaintiff Fact Sheet]." *Id.* at 11.

- In *Issue Ruling Two*, I agreed with the PBMs "that many of the moving plaintiffs' motions to amend are procedurally improper," and I denied those plaintiffs' motions. *Issue Ruling Two* at 2.

- In *Issue Ruling Four*, I cited *In re: CVS Pharmacy* for the proposition that "efficiency must not become a substitute for the pleading discipline required by

---

[5] *See Issue Ruling Two* at 4 ("The complaints in the cases against the PBMs in this MDL—and the amended complaints, if ultimately allowed—are all virtually identical.").

the Federal Rules" and denied numerous plaintiffs' motions for leave to amend because they had offered insufficient "defendant-specific factual allegations." *Issue Ruling Four* at 6-8.

- In *Issue Ruling Five*, I agreed with the PBMs that some of the individual plaintiffs were not diligent in meeting the Court's amendment deadline, so I denied those plaintiffs' motions. *Issue Ruling Five* at 28.

Furthermore, the PBMs' petition fails to disclose that, in several *Issue Rulings*, I overruled the PBMs' arguments ***without prejudice***, explaining they could raise their arguments again in each individual case when it became procedurally appropriate. Specifically:

- In *Issue Ruling Three,* I concluded the PBMs' "futility arguments do not support denial of the motion for leave to amend filed by any plaintiff." *Issue Ruling Three* at 2. This is because, in every case, there existed at least one valid claim that was ***not*** futile, thus providing support for granting the motion to amend. *Id.* at 8. But I made this ruling "without prejudice" and noted the PBMs could reassert their futility arguments "in a single motion to dismiss [filed in the individual case], where the arguments are cleanly and plainly presented before the Court." *Id.* (cleaned up; bracketed language in original).

- In *Issue Ruling Three*, I also concluded certain other issues could not be resolved in the context of a motion to amend, but stated: "[t]he PBMs can and should raise these arguments again in a motion to dismiss or for summary judgment." *Id.* at 7.

The PBMs describe the *Issue Ruling* process as unfair and designed to work against them. But the actual results of the process demonstrate otherwise.

It is also worth noting how the MDL plaintiffs responded to those *Issue Rulings* where I sustained the PBMs' and other defendants' arguments. Steps five and six of the process required the parties to let me know if an *Issue Ruling*, when applied to an individual case, required denial of that case's specific motion to amend. Rather than merely notifying me, however, and waiting for me to enter an order on the docket, the individual plaintiffs ***simply withdrew their motions***. Thus, in their concluding report to me after I delivered my final *Issue Ruling Six*, the parties stipulated that individual plaintiffs had withdrawn their motions to amend as shown in the following chart.

| Defendant in Motion to Amend | Number of Individual Plaintiffs that Withdrew their Motion to Amend to add that Defendant | Number of Individual Plaintiffs that Maintained Their Motion to Amend to Add that Defendant |
|---|---|---|
| Ahold Delhaize | 27 | 120 |
| Albertsons | 43 | 136 |
| Aurolife | 126 | 171 |
| Costco | 13 | 0 |
| Discount Drug Mart | 8 | 25 |
| KVK Tech | 112 | 352 |
| Lupin | 14 | 40 |
| Publix | 48 | 5 |
| Target | 9 | 0 |
| Tris | 212 | 0 |
| Winn-Dixie | 30 | 33 |
| PBMs (collectively) | 1034 | 793 (approx.) |
| **TOTAL** | **1676** | **1675** |

*See* MDL docket no. 6636.

These figures reveal two things. First, the *Issue Rulings* process worked not only with regard to the PBMs, but all of the other defendants whom the individual plaintiffs sought to add. The process was efficient while respecting all parties' rights and culminated in case-specific, plaintiff-specific, and defendant-specific decisions. No other defendant has sought mandamus relief.

Second, it is a gross distortion for the PBMs to assert that I "did not deny leave to amend to any plaintiffs, except for those whose motions were moot because the plaintiffs had earlier withdrawn." Petition at 18. As the PBMs know, the individual plaintiffs only withdrew their motions ***because I indicated in my Issue Rulings that I was going to deny them***. The PBMs paint a picture that I allowed plaintiffs "amendment carte blanche," but this is soundly belied by a full and fair reading of the entire *Issue Ruling* process, which yielded a 50% overall motion denial rate.

Finally, the Panel should take careful note of a revealing component of the *Issue*

*Ruling* process. The PBMs assert that, in contrast to the plaintiffs' "generalized" briefing on the omnibus motions to amend, the PBMs supplied "individualized evidence and argument" for each case. Petition at 2, 13. The PBMs go so far as to characterize their briefing as fully bespoke: "OptumRx and Express Scripts filed an extensive opposition brief that addressed each plaintiff separately, as the Rules require. * * * [T]he opposition made different arguments against different proposed amendments based on the actual facts of the individual plaintiffs." *Id.* at 12.

This is truly charade. The brief that PBMs' cite does list each moving plaintiff, but then ***repeats verbatim the same arguments hundreds of times for each one.*** Thus, for example, on page 148 of the PBMs' Joint Opposition Brief (MDL docket no. 6172), PBMs list plaintiff Cuyahoga County, Ohio and present a two-paragraph "individualized" argument titled "Lack of Diligence." The PBMs then repeat the exact same two-paragraph argument 877 more times in their "individualized" presentation, changing only the name of the plaintiff. The PBMs replicate the same tactic with their "Prejudice Due to Loss of Evidence" argument (repeated verbatim 823 times), their "Failure to State a Claim" argument (repeated verbatim 864 times), their "RICO Statute of Limitations" argument (repeated verbatim 768 times), their "Negligible Market Share" argument (repeated verbatim 727 times by Optum and 540 by ESI), and so on.

These are not bespoke, individualized arguments applicable to individual plaintiffs. The PBMs' extreme use of rote repetition actually provides the best argument ***in defense*** of my use of the *Issue Ruling* process. The Sixth Circuit affirmed my "broad discretion to create efficiencies and ***avoid duplication*** . . . across cases within the MDL," yet it is hard to imagine a ***less*** efficient, ***more*** duplicative mechanism than what the PBMs insist is required: the plaintiffs must submit 1,800 redundant motions to amend, and must attach 1,800 redundant 300-page complaints, in response to which the PBMs must generate (as they actually did here) 1,800 redundant oppositions. The only efficient aspect of the PBMs' approach is their use of cut-and-paste.

## III. "The Sixth Circuit Will Reverse Me in a Heartbeat."

Three times in their petition, the PBMs quote something I said when I described the *Issue Ruling* process I intended to follow. During an in-court status conference, from the bench, I said: "I'm not going to allow 800 amendments adding the PBMs, nor am I going to allow zero. Okay? And if I did one or the other, the Sixth Circuit would reverse me in a heartbeat. So that isn't going to happen." Tr. at 10 (Sept. 10, 2025) (MDL docket no. 6273).

In their petition, the PBMs exclaim: "But in July 2026, the court did just that,

granting leave to amend to 800 plaintiffs following six 'issue rulings' that categorically rejected the PBMs' arguments without addressing any individual plaintiff." Petition at 15.

First, as described above, it is simply false that I "categorically rejected the PBMs' arguments." In numerous instances, I ***agreed*** with the PBMs, adopted their arguments, and delivered *Issue Rulings* that worked to deny many motions to amend.

Second, the only reason I did not "address[] any individual plaintiff" is that, during step 5 of the *Issue Ruling* process, the parties ***agreed*** on how each one of my *Issue Rulings* applied to every individual motion. Thus, during the final step 6 of the process, the PBMs ***never asked me to provide even one individualized ruling***.

And third, the PBMs apparently hope that repetitive quotation will force my statement to carry far more meaning than it can support. The simple truth is that I used the phrase "800 cases" as shorthand for "all cases."[6] I believed then and still believe that I would be reversed if I granted ***every*** plaintiffs' motion to amend, or granted ***none***, because doing either would strongly suggest I did not comply with the Sixth Circuit's mandate that I "determin[e] the parties' rights in [each] individual case." *In re: CVS Pharmacy*, 956 F.3d at 841.

The facts are: (1) about 1,800 plaintiffs filed motions to amend to add the PBMs; (2) in my *Issue Rulings*, I denied many motions and plaintiffs withdrew many motions; and (3) ultimately, I granted about 800 of those motions to amend, which is not "every" and is not "none." In my statements from the bench, I meant I would surely not grant all of the plaintiffs' motions and would surely not deny all of them. I later applied the federal rules and, as predicted, did neither. The PBMs are playing "quotation gotcha." That I said "800" and then granted 800 is happenstance, not harbinger, as the PBMs insist.

---

[6] I meant to say "1,800 cases" (or ***did*** say that, but the court reporter missed it), which would have been how many cases actually had pending motions to amend. *See* PBMs' Joint Opposition to Plaintiffs' Omnibus Motions for Leave to Amend at 2 (MDL docket no. 5885) (discussing "1,833 Moving Plaintiffs"). And, in fact, I ***did*** say "1,800 cases" when I made an identical statement from the bench during an earlier conference with the parties. *See* tr. at 86-87 (March 12, 2025) (MDL docket no. 6038) ("The PEC has asked me to let them add the PBMs to 1,800 cases. PBMs have taken the position that I should deny it completely and not allow any additions. Okay? Does either side believe that there is any likelihood that the Court of Appeals would sustain me on either of those positions?").

In both instances, what I meant was "all cases," regardless of the number.

## IV. My *Issue Ruling Five* Addresses the Most Difficult Question Presented—Diligence.

It does not surprise me that the bulk of the PBMs' petition challenges my conclusion regarding whether the plaintiffs were diligent. Petition at 28-38. This was the hardest issue for me to resolve. The essential question is: when did the individual plaintiffs in this MDL have a sufficient basis to pursue their claims against the PBMs, and once armed with this knowledge were they reasonably diligent in moving to amend their complaints? I concluded no moving plaintiff had a sufficient, defensible basis to state a claim against the PBMs until January of 2023, and at that time no plaintiff was even permitted to move to amend until I lifted my moratorium.

I was aware when I delivered *Issue Ruling Five* that another federal district court judge—the Honorable Patti Saris, with whom I studied in college and law school and greatly respect—decided a closely-related question adversely against a similarly-situated plaintiff. Specifically, when assessing diligence in the context of the "discovery rule," she concluded the opioid plaintiff should have discovered the injuries the PBMs allegedly caused in 2018, so the 2024 complaint was filed too late. And since then, as the PBMs note, Judge Saris has been affirmed. *City of Boston v. Express Scripts, Inc.*, 765 F. Supp. 3d 31 (D. Mass. 2025), *aff'd sub nom. City of Bos. v. OptumRx, Inc.*, 169 F.4th 58 (1st Cir. 2026).

It also does not surprise me, however, that at least three other federal judges ruled differently than Judge Saris and decided the same question in favor of an opioid plaintiff and against the PBMs, as I did. Specifically:

- In *Alaska v. Express Scripts, Inc.*, 774 F. Supp. 3d 1150 (D. Alaska 2025), the Honorable Sharon L. Gleason refused to dismiss claims against the PBMs, concluding: "It is thus plausible that the State did not discover—and could not have discovered, given Express Scripts' alleged fraudulent misrepresentations—evidence to support its case against Express Scripts until its counsel received discovery in the MDL [in January of 2023]." *Id.* at 1166. Judge Gleason reached this conclusion even though the plaintiff in *Alaska* is represented by MDL co-lead counsel, Motley Rice, a fact by itself that the PBMs wrongly insist makes Judge Gleason's conclusion incorrect. *See* Petition at 32.

- In *King County v. Express Scripts, Inc.*, No. 24-CV-49, 2025 WL 1082130 (W.D. Wash. Apr. 10, 2025), the Honorable Barbara J. Rothstein reached the same conclusions as Judge Gleason, for the same reasons—specifically, that plaintiffs only obtained critical information "in 2023" and so did not fail to timely file their lawsuit. *Id.* at *3. Similar to *Alaska*, the plaintiff in *King County* was represented by Keller Rohrback, which is a member of the MDL PEC.

- In *Ohio County Commission v. Express Scripts, Inc.*, No. 5:24-CV-142, 2024 WL 5701504, at *2-3 (N.D. W.Va. Dec. 23, 2024), the Honorable John P. Bailey also reached the same conclusion as Judges Gleason and Rothstein, rejecting the PBMs' argument that "plaintiffs knew, or should have known, of their claims by September 2019 at the latest." *Id.* at *3. And again similar to *Alaska*, the plaintiff in *Ohio County Commission* was represented by MDL co-lead counsel Farrell & Fuller.

That different federal judges reached different conclusions regarding the diligence of similarly-situated plaintiffs is largely explained by the applicable standard under Fed. R. Civ. P. 16: "trial courts have ***considerable discretion*** in determining what kind of showing" is required. *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 988 (10th Cir. 2019) (quoting 3 *James Wm. Moore, Moore's Federal Practice - Civil* § 16.14[1][b] (3rd ed. 2019)); *see Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010) ("A district court, generally speaking, has considerable discretion in deciding whether to grant" a motion to amend a complaint).[7]

I cannot help but observe that, based on my supervision of this MDL for nearly nine years and counting, my knowledge of the entire procedural and evidentiary record surrounding the question of whether MDL plaintiffs were diligent is certainly more comprehensive than any of the judges listed above. Indeed, Judge Saris was apparently not aware that the PBMs insisted (in a May 2021 letter threatening a motion for sanctions in another, early PBM opioid case) that the plaintiffs had ***no evidentiary basis*** for their claims. As I have explained, this warning by PBMs that a plaintiff will violate Rule 11 if it moves to amend is highly relevant to the question of whether that plaintiff was diligent when it waited to file that motion. *See Issue Ruling Five* at 26-27. Further, Judge Saris did not address the ongoing moratorium I had imposed on filing motions to amend, nor the obscure nature of what the PBMs actually do, both of which also factor into the question of diligence.

Ultimately, I have a deep understanding of all the relevant facts and procedural history, and I exercised my broad discretion to allow certain MDL plaintiffs to amend

---

[7] It is also worth noting that new Rule 16.1, which is the first federal rule to provide specific guidance for MDL cases, suggests an MDL Court enjoys ***especially*** broad discretion when assessing diligence and good cause in the context of allowing a motion to amend. The Advisory Committee Notes state: "There is no requirement under Rule 16.1 that the court set specific time limits or other scheduling provisions as in ordinary litigation under Rule 16(b)(3)(A). Because active judicial management of MDL proceedings must be flexible, ***the court should be open to modifying its initial management order in light of developments in the MDL proceedings***." Fed. R. Civ. P. 16.1(c) cmt. (emphasis added).

and add the PBMs as defendants. It is fundamental that "a writ of mandamus is an extraordinary remedy that [the Panel] will not issue absent a compelling justification." *In re Acker*, 596 F.3d 370, 372 (6th Cir. 2010). Given that three other federal judges considering the question of diligence reached similar conclusions as I did on similar facts in similar PBM opioid cases, there is certainly no justification here for the writ at all.

## V. The Practicalities of this MDL Also Counsel Against Granting the Writ.

I believe the discussion above, grounded firmly in the Rules of Civil Procedure and the Sixth Circuit's analysis in *In re: CVS Pharmacy*, and reflecting the full and true factual and procedural history of the Opioid MDL, show convincingly that the PBMs' petition is without merit.

In addition, however, I want to add a brief explanation of why granting the writ would be bad policy. *See P. Beiersdorf & Co. v. McGohey*, 187 F.2d 14, 15 (2nd Cir. 1951) (an appellate court may consider the "practical effect[s]" when "entertain[ing] the petition for a writ of mandamus"). To be clear, I am not urging the Panel to deny the writ only (or even primarily) because of the policy reasons set forth below. But these considerations are fully consonant with the result the Panel should reach after weighing the merits.

Including the instant case, the Sixth Circuit has received 14 mandamus petitions from MDL defendants. Only one of them, the petition filed in *In re: CVS Pharmacy*, was granted. Five of the petitions were filed by the PBMs. With those five, the PBMs sought: (1) to force my recusal, *see* case no. 25-3429 (denied); (2) to force recusal of the special master, *see* case no. 23-3882 (denied); (3) to force recusal of plaintiffs' co-lead counsel, *see* case no. 24-3396 (denied); (4) to force me to withdraw orders requiring PBMs to produce discovery, *see* case no. 25-3006 (denied); and (5) now, in this case, to force a severe limit on the number of MDL cases against the PBMs.

Granting the PBMs' fifth attempt to obtain mandamus relief will carry serious negative consequences:

- The Opioid MDL has been described as "the largest and most complex civil case in the nation's history." Sara Randazzo, *Opioid-Addiction Litigation Heads to Complex Trial*, Wall Street Journal (Oct. 20, 2019). Plaintiffs named dozens of defendants that participate in the opioid supply chain and allegedly contributed to a nation-wide drug crisis; several of these defendants are among the largest companies in the world.

  Given the size and complexity of the MDL, I had no choice but to engage in a sort of triage—first focusing on claims against opioid manufacturers, then

opioid distributors, then opioid dispensers, and finally the PBMs. During the nine years it has taken so far, I placed a moratorium on amending complaints.

To allow the PBMs to escape full attention in this MDL because I prioritized other categories of defendant first would be unfair to every plaintiff in this MDL, which includes virtually every city and county in the United States (as well as Indian Tribes, Third-Party Payors, Hospitals, and others). Indeed, it would also be unfair to the other defendants whose cases were chosen for litigation first. The PBMs are involved in every aspect of the nation's healthcare and health insurance business. Whether any of the plaintiffs' claims against PBMs will survive motions to dismiss or for summary judgement, and if so what a jury will do with them, are questions for another day. But litigation of cases in the MDL should reflect the PBMs' national significance.

- If plaintiffs are not allowed to amend their MDL complaints to add claims against PBMs, they are not going to fold up their tents and go home. Rather, plaintiffs will file new complaints in other courts around the country. This will surely lead to precisely the results the MDL venue statute, 28 U.S.C. §1407, was designed to avoid: a flood of subpoenae, uncoordinated discovery deadlines, conflicting party requests, contradictory court rulings, and "pretrial chaos" in all of these courts. *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 493 (J.P.M.L. 1968). Federal courts "will appear unable to do what they are supposed to be best at—resolving the biggest and most complicated of disputes." David R. Cohen, *The Most Powerful Federal Venue Statute of All*, Inter Alia Magazine (Fed. Bar Assn. Aug. 2010).

  Indeed, the fact that this "chaos" will likely ensue undermines the PBMs' spurious insinuation that my ruling is motivated by consideration of settlement pressure. Petition at 9-10. If anything, settlement pressure on the PBMs will ***increase*** if the Panel grants the petition, because their litigation expense would quickly shoot higher, as would the number of cases actually tried (possibly to adverse verdicts).

To repeat, these policy reasons did ***not*** motivate any of my rulings that PBMs challenge with their petition. I designed the *Issue Ruling* process with an eye only toward complying with the mandate of *In re: CVS Pharmacy*—that is, seeking efficient MDL management while still protecting the rights of the each party in each individual case. But the PBMs are asking the Panel (for the fifth time) not only to interfere with my discretionary management of the Opioid MDL, but also to ignore the practical effects of their request.

## VI. Conclusion.

Only by presenting an incomplete and misleading recitation of the procedural and evidentiary history of this MDL are the PBMs able to support their argument that I have "persistently disregarded" the Federal Rules of Civil Procedure. To the contrary, I have worked very hard to follow the Sixth Circuit's mandate in *In re: CVS Pharmacy*, ever since it was issued six years ago. I believe that, after the Panel reads all of my six *Issue Rulings* and my final "Order Regarding Plaintiffs' Motions for Leave to Amend" (all attached), the truth of my adherence to the rules will shine through.

In the final analysis, "[m]andamus is an appropriate remedy in extraordinary circumstances only," but there are no exceptional conditions in this case; the PBMs have not shown a "clear and indisputable right" to the issuance of the writ. *In re Smith*, 332 F. App'x 734, 736 (3rd Cir. 2009); *United States v. Gomez-Gomez*, 643 F.3d 463, 471 (6th Cir. 2011). Accordingly, the Sixth Circuit should dismiss the PBMs' petition.

Please contact me if you need any additional information regarding this matter.

Respectfully,

Dan Aaron Polster